# IN THE COURT OF APPEALS OF IOWA

No. 19-0165
Filed April 3, 2019

**IN THE INTEREST OF L.M., D.M., and M.M.,**
**Minor Children,**

**J.E., Mother of L.M. and D.M.,**
        Appellant,

**J.M., Father,**
        Appellant.
_____

Appeal from the Iowa District Court for Lee (North) County, Ty Rogers, District Associate Judge.

A mother appeals the termination of her parental rights to two children; a father appeals the termination of his rights to three children. **AFFIRMED ON BOTH APPEALS.**

Alicia M. Stuekerjuergen of Stuekerjuergen Law Firm, PLC, West Point, for appellant mother.

William Monroe, Burlington, for appellant father.

Thomas J. Miller, Attorney General, and Anagha Dixit, Assistant Attorney General, for appellee State.

Heidi Van Winkle, Burlington, guardian ad litem for minor children.

Considered by Potterfield, P.J., and Tabor and Bower, JJ.

**TABOR, Judge.**

The juvenile court terminated the parental relationships of three children: seven-year-old M.M., four-year-old L.M., and two-year-old D.M. In separate appeals, Jennifer, the mother of L.M. and D.M., and James, the father of all three children, seek to reverse the termination order.[1] Jennifer argues (1) the State failed to offer clear and convincing evidence the younger children could not be presently returned to her care; (2) termination was not in the children's best interests; and (3) termination will be detrimental to the children because of their close relationship with her. Both parents contend the court did not hold the State to the requirement of making reasonable efforts toward reunification.

After independently reviewing the record, we reach the same conclusion as the juvenile court.[2] Jennifer and James have allowed their children to become mired in "a predictable cycle of removal, return, deterioration of parental behavior, and subsequent removal of the children." The cycle has been hard on the children, causing them to "struggle behaviorally" and leaving them with the "uncertainty of not knowing" what will happen in their lives. The State proved grounds for termination and made reasonable efforts to reunify the family. *See* Iowa Code § 232.116(1)(f), (h) (2018). Despite a strong bond with their biological parents, the

---

[1] M.M.'s biological mother is deceased.

[2] We review termination proceedings de novo, giving the facts and law a fresh look and adjudicating anew those issues properly preserved and presented. *In re L.G.*, 532 N.W.2d 478, 480 (Iowa Ct. App. 1995). We are not bound by the juvenile court's factual findings but give them weight, especially when witness credibility is key. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). As the petitioning party, the State must offer clear and convincing proof, which means we have no "serious or substantial doubts as to the correctness [of] conclusions of law drawn from the evidence." *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010) (quoting *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000)).

children will benefit from breaking out of the cycle of removal and moving toward adoption. *See* Iowa Code § 232.116(2), (3)(c). Accordingly, we affirm the termination order.

## I. Facts and Prior Proceedings

This family drew the attention of the Iowa Department of Human Services (DHS) as far back as December 2014 because Jennifer and James were using methamphetamine while caring for M.M. and L.M. The DHS offered the family voluntary services. But continued concerns of substance abuse prompted the juvenile court to adjudicate M.M. and L.M. as children in need of assistance (CINA) in September 2015 and to approve their removal from parental care in December 2015. D.M. was born in March 2016. The juvenile court ordered M.M. and L.M. to remain as CINA, but returned them to their parents' care in November 2016.

The return was short-lived. The strained relationship between Jennifer and James led them to voluntarily send the children back to the home of foster parents Paul and Candice. In January 2017, Jennifer and the children moved in with her mother. Continued concern about the parents' drug use prompted another removal of the children in February 2017. All three children have stayed with foster parents Paul and Candice since that time.

In the spring of 2017, both parents were incarcerated—Jennifer at the Iowa Correctional Institution for Women in Mitchellville for drug charges and James at the Mount Pleasant Correctional Facility for driving while barred. James was released to a halfway house in Burlington in late October 2017. While there, James obtained employment and resumed visitation with the children. Jennifer also moved to a half-way house in Ottumwa in December 2017, where she started

participating in substance-abuse treatment. In its November 2017 permanency order, the juvenile court decided termination was not in the children's best interests and agreed to continued placement of the children for an additional six months to allow the parents time to comply with services after their release from prison. The court set review for April 2018.

In May 2018, the juvenile court issued a "Permanency Planning Hearing Order." The order recounted testimony that the children were very bonded to their foster parents but also expressed love for Jennifer and James. The court expressed concern for the ability of both Jennifer and James to show sustained periods of testing negative for controlled substances. In addition, the court shared the DHS expectation that Jennifer and James engage in "relationship counseling" given the volatile history of their interactions. The court also advised that James needed to "greatly increase his level of communication" with the DHS.

In that same order, the court faulted the DHS for not affording Jennifer and James adequate visitation with the children while they were incarcerated. The court noted an unnecessary delay in setting up the requested visits: "more than four months after Jennifer was incarcerated and approximately seven months after James was incarcerated."

In early August 2018, the juvenile court held a two-day hearing on the issue of visitation. The State presented witnesses who testified about negative behaviors exhibited by M.M. and L.M. related to having unsupervised visits with Jennifer and James. M.M.'s counselor testified the seven year old had regressed in her behaviors because of her anxiety that Jennifer and James would start fighting again while caring for the children. Candice, the children's foster mother,

testified both M.M. and L.M. had been more aggressive toward their siblings in the past few months, and she attributed the children's deteriorating behavior to the transition toward unsupervised visitation with James and Jennifer. Candice also observed D.M. had become "more clingy" after recent interactions with the biological parents. In an August 15 order, the juvenile court found it was contrary to the children's best interest to order the DHS "to comply with a rigid graduated visitation schedule." The court held: "The children should not be subjected to unsupervised visitation until the Department, in close consultation with the children's mental health professional, determine the children are emotionally ready to participate in such visitation."

In late August, the State filed a petition for termination of parental rights. The children's guardian ad litem reported to the court her reasons for supporting termination: "The parents have failed to show a sustained ability for change. They have failed to show that the children can be safely reunified with them. It is not in the children's best interest emotionally or physically to be returned."

The juvenile court held a joint permanency and termination hearing in early November 2018. The State offered testimony from the DHS caseworker, as well as the children's counselor and the foster mother. Both Jennifer and James testified they would be able to resume care of the children. In January 2019, the juvenile court issued an order terminating parental rights under Iowa Code section 232.116(1)(f) with respect to M.M. and L.M. and (h) with respect to D.M. Both parents filed petitions on appeal.

## II.    Untimeliness of State's Response

Before discussing the merits of the parents' issues, we address Jennifer's challenge to the timeliness of the State's response to her petition on appeal.  She contends we should refuse to consider the response because it was not filed within fifteen days of service of her petition on appeal, as required by Iowa Rule of Appellate Procedure 6.202(2).  Jennifer electronically filed her petition on appeal February 12, 2019, and the State filed its response on March 4, 2019.  James electronically filed his petition on appeal on February 13, 2019.

The State contends its joint response to both parents was timely because fifteen days after February 13 (the date of the father's filing) was February 28.  The State then argues we should add three days to the prescribed period after service of the father's petition on appeal, which was March 3.  *See* Iowa R. App. 6.702(5).  Because March 3 fell on a Sunday, the State argues its filing on Monday, March 4, 2019 was timely "given the applicable statutes."  *See* Iowa Code § 4.1(34) (providing in computing filing deadlines, time shall be extended "to include the whole of the following Monday" when the last day falls on Sunday).

We disagree with the State's calculation.  Its fifteen days to respond to Jennifer's petition started on February 12—creating a filing deadline of February 27.  The addition of three days for service under rule 6.702(5) did not extend the State's window for filing because service was not by mail, email, or fax transmission.  After Jennifer electronically filed her petition on appeal, EDMS served the document on the State.  *See* Iowa Ct. R. 16.315.  No other service was required.  *Id.*  The State's response was due on Wednesday, February 27.  Its filing on March 4 was untimely.

The State alternatively argues even if its response was not timely filed, "the parents were not prejudiced by the additional time in filing." We disagree with the State's harmlessness argument. Because the State did not comply with the appellate deadlines, we decline to consider its response to the parents' petitions on appeal.[3] *See Inghram v. Dairyland Mut. Ins. Co.*, 215 N.W.2d 239, 239 (Iowa 1974) (holding supreme court was "not bound to consider a party's position" where the party failed to comply with appellate rules).

## III. Analysis

Juvenile courts follow a three-step analysis under Iowa Code section 232.116 when addressing a petition to terminate parental rights. *In re P.L.*, 778 N.W.2d 33, 39 (Iowa 2010). The court must first decide if the State has proven a ground for termination under section 232.116(1). *Id.* If so, the court must apply the best-interests framework set out in section 232.116(2). *Id.* Finally, if the statutory best-interests framework supports termination of parental rights, the court must consider if any of the factors in section 232.116(3) weigh against the termination. *Id.* Because Jennifer challenges all three steps in her petition on appeal, we will address each in turn.[4]

---

[3] Because the appellee's response was optional under rule 6.202(2), we proceed to the merits of the mother's claims.

[4] Jennifer frames her first argument as follows: "whether the Juvenile Court erred in finding the State of Iowa proved by clear and convincing evidence that the permanency goal in the CINA cases should be changed to termination of parental rights." Because the termination order rendered the propriety of that initial finding moot, we address only the challenge to the termination itself. *See In re B.B.,* 516 N.W.2d 874, 877 (Iowa 1994) (holding issue is moot if it no longer presents a justiciable controversy because it has become academic).

**A. Statutory Grounds for Termination**

The juvenile court found termination of parental rights was proper under paragraphs (f) and (h) of Iowa Code section 232.116(1).[5] Both paragraphs allow the court to terminate if a child of a specified age has been adjudicated CINA, has been out of the parent's custody for the requisite time period, and cannot be returned to the parent at present without continued risk of adjudicatory harm. The children were adjudicated as CINA and had been out of Jennifer's custody for twenty months at the time of the termination hearing. She challenges only the finding that L.M. and D.M. could not be returned to her care. *See D.W.*, 791 N.W.2d at 707 (interpreting statutory language "at the present time" to mean the time of the termination hearing).

Jennifer argues she was ready to resume custody because she had employment, a safe home, and had been "sober for at least one year and seven months." We applaud Jennifer's progress toward personal stability. But we share the juvenile court's overarching worry that the children cannot be returned to Jennifer's care given the danger that her volatile relationship with James will result in neglect or maltreatment. Jennifer did not meet the court's expectation to complete counseling with James "to work through their relationship issues and help them gain an understanding of how to manage conflict in a healthy way as opposed to arguments and or fighting."

---

[5] Paragraph (f) applies to children four years of age or older (here M.M. and L.M.) who have been out of parental custody for at least twelve of the last eighteen months and any trial period at home has been less than thirty days. Paragraph (h) applies to children three years of age or younger (here D.M.) who have been out of parental custody for at least six of the last twelve months and any trial period at home has been less than thirty days.

The court reasoned, "The proclivity of James and Jennifer to fight and argue is extremely detrimental to the children's mental well-being. In the past, this fighting has been a precursor to James and Jennifer separating and a trigger for narcotics use—a cycle that has led to multiple removals" for the children. The court also noted, while the DHS has no current concerns that Jennifer has relapsed, it "has significant and valid concerns regarding her likely potential for drug use in the future, particularly when faced with the stressors of caring for multiple children full time." We agree with the juvenile court's reasoning. A parent's past performance is a reliable indicator of what the children can expect going forward. *See In re T.D.H.*, 344 N.W.2d 268, 271 (Iowa Ct. App. 1983) ("We posit that it was much more reasonable for the court to look at past facts than future hypotheses.").

## B. Best Interests

Jennifer next argues termination was not in the best interests of L.M. and D.M. In determining best interests, we give primary consideration to the children's safety, to the best placement for furthering their long-term nurturing and growth, and to their physical, mental, and emotional condition and needs. *See* Iowa Code § 232.116(2); *see also P.L.*, 778 N.W.2d at 40 (rejecting use of an unstructured best-interests test). That consideration may include a child's integration into their foster family and whether the foster family is willing to adopt the children. *See* Iowa Code § 232.116(2)(b).

The juvenile court found, "James and Jennifer have simply not shown an ability to provide stability for the children and keep them safe in the future despite very ample opportunity to do so." We agree with that finding. The record shows

the experience of removal followed by return followed by removal was hard on L.M., and even two-year-old D.M. showed signs of stress when the parents were transitioned to unsupervised visitation. The juvenile court aptly observed, "The children's young age makes permanent stability extremely important to their long term emotional and mental health." The record shows the children were flourishing in the care of their foster parents. The foster parents expressed the willingness to adopt all three children. Under these circumstances, termination of parental rights served the children's best interests.

### C. Closeness of Parent-Child Relationship

Jennifer also alleges termination would be detrimental to D.M. and L.M. because of the closeness of the parent-child relationship. *See* Iowa Code § 232.116(3)(c). The evidence shows the children *do* share a strong bond with Jennifer and "enjoy their time with her." But the record *does not* suggest their relationship was so close that L.M. and D.M. would be disadvantaged by the termination or that any detriment would outweigh the ongoing risk Jennifer would be unable to provide a safe and stable home for her children in the long term. *See D.W.*, 791 N.W.2d at 709. Under these circumstances, section 232.116(3)(c) does not stand in the way of termination.

### D. Reasonable Efforts

Finally, both Jennifer and James claim the DHS failed to make reasonable efforts to bring the children home. Under Iowa Code section 232.102(7), the DHS is required to "make every reasonable effort" to return children to their parents' care "as quickly as possible" consistent with the children's best interests. *In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000). The reasonable-efforts requirement is

not "a strict substantive requirement of termination." *Id.* But when relying on paragraphs (f) and (h) as the grounds for termination, the State must show the DHS made reasonable efforts at reunification as part of its ultimate burden of proof. *See In re L.T.*, ____ N.W.2d ____, 2019 WL 982910, at *5 (Iowa 2019).

The visitation arrangement is a key ingredient in reintegrating children into the family, which must be balanced with protecting them from the harm responsible for their removal in the first place. *In re M.B*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996). But visitation is not viewed in a vacuum—"[i]t is only one element in what is often a comprehensive, interdependent approach to reunification." *Id.*

Jennifer contends the DHS should have increased the frequency of visitation and allowed unsupervised interactions. James blasts the termination order's conclusion that the DHS satisfied the reasonable-efforts requirement despite stalling the progression of visitation. He argues it is contrary to the court's May 2018 conclusion that the DHS did not make reasonable-efforts to provide visitation with the children while the parents were in prison.

James also criticizes the juvenile court's August 15, 2018 decision to roll back unsupervised visitations until the DHS—in conjunction with the children's counselor—determined the children were emotionally ready for that level of interaction. He contends the court improperly delegated its authority to determine the sufficiency of services to a third party. *Cf. In re Marriage of Stephens*, 810 N.W.2d 523, 530 n.3 (Iowa Ct. App. 2012) (holding dissolution court may not delegate its judicial power to determine visitation or custody arrangements to the parties or a third party).

We find the DHS made reasonable efforts to reunify the children with James and Jennifer, including setting up visits consistent with the children's best interests. After the parents were released from prison in 2017, the juvenile court delayed permanency for six months to allow more time for visitation that could facilitate reunification.  And contrary to James's argument, the juvenile court did not outsource its duty to oversee the provision of services to this family.  The juvenile court listened to the evidence in August 2018 and carefully weighed the witnesses' opinions concerning the toll on the children from unsupervised visitation with Jennifer and James.  Its caution in not going forward with unsupervised visitation until the children were mentally prepared for that transition gave appropriate consideration to the children's best interests.

We see no basis to reverse the termination order.

**AFFIRMED ON BOTH APPEALS.**